let me say a welcome to Judge Susan Bolton from United States District Court for the District of Arizona, who's kind enough to join us and assist on this panel. It's an honor and a privilege to have you with us. And we'll go ahead and call the first case, Nelson versus Attorney General. Counsel for petitioner, would you please identify yourself for the record? Hi, this is Michael from the Thomas R. Klein School of Law. And I just want to introduce both arguing counsel who are certified law students, Brian Loughnane and Emily Miles. Okay. And we have, according to the minutes, Mr. Loughnane, you're going to be speaking to the risk of torture aspect of the case. I take it you're up first. That is correct, Your Honor. Okay, you may proceed. Great, thank you. Now, good morning, Your Honors, and may it please the court. As Professor Frankel just introduced, my name is Brian Loughnane and I'm joined by my partner, Emily Miles, and we represent Mr. Nelson in this consolidated appeal concerning his underlying claim for relief under the Convention Against Torture and subsequent motion to reopen. Now, at this time, I would like to reserve two minutes for rebuttal. Now, Mr. Nelson, I'm sorry, Judge. I said done, you get two minutes for rebuttal. Thank you, Judge. Now, Mr. Nelson is a man who put himself at significant personal risk when he went out of his way to help a gay friend avoid a violent attack by a Jamaican gang. Now, this case is about the BIA cutting corners in its efforts to return Mr. Nelson to Jamaica where he will likely be killed. And so accordingly, this court should grant Mr. Nelson's petition for the following two reasons. First, the agency made significant errors with respect to its analysis of Mr. Nelson's risk of future torture. And then second, the agency then failed to adequately assess whether Jamaican authorities would acquiesce to that torture. And as Professor mentioned, I will primarily be, I'm sorry, Judge. Go ahead. You're gonna speak about the first of those two things. And we've read your briefing, so we're familiar with the facts. Maybe you could begin by first dealing with the waiver issue. The government's asserted that you didn't really address the NAM in your briefing. And so you shouldn't be heard to be making an argument based on that case now. What's your response to that? That's correct, Your Honor. However, the waiver issue is not a hard and fast rule. Rather, we have the Albertson factors, which lays out the considerations for when this court can still consider despite a waiver. And separate and apart from that, we have that here because there was an intervening change in law with respect to the Luziga decision, which hadn't been decided until after the opening brief had been submitted. Did Luziga change the law? Luziga expanded on how the NAM factors should be applied. And the agency had never really considered how that change in law would be appropriately considered. However, I will say that Ms. Miles is slightly more prepared to address the particularly serious crime issues rather than perhaps myself will be, but I am happy to continue to move forward unless you'd like to. No, let's assume for the sake of discussion that it's not waived. And perhaps you could address, how would we decide this without getting engaged in sort of an endless recursive loop? Your argument is, if I understand it correctly, that the government didn't really give him a chance to corroborate his story. If they were gonna say that he hadn't done enough, they should have given him an opportunity to corroborate it. And they didn't do that. So they didn't play by their rules. So it should go back. Have I got that piece of your argument correct or am I misunderstanding it? That is a piece of argument, but not the whole argument, but you are right. I know it's not the whole argument, but I just wanna focus on that for a minute. How does one avoid the assertion then that every case where the government says, well, you haven't done enough and therefore you haven't met your burden of proof is a case where they broke the rules about corroboration and it's gotta go back. In other words, here, they just said, okay, we hear you. We got your letters. We give them full weight. We just don't think that's enough. You haven't demonstrated enough, so you're done. And your argument is, well, they should have given him a chance to corroborate. Why couldn't that be said in every single case? And therefore every case turned into one where it's gotta go back because if they haven't done enough, they have an entitlement to corroboration. Well, it's not so much that the agency here said we will give this full weight and not give it enough. Rather, what happened was that Mr. Nelson had four letters from witnesses who were prepared to testify on his behalf in support of the conditions with respect to the bad boys' continued interest in harming him. They submitted those letters and they were submitted without objection and without any indication to Mr. Nelson as to whether or not the credibility of those statements would be challenged. And so after the fact, the IJ pointed out that the witnesses were never cross-examined and thus did not give the letters all that significant amount of weight. Had the agency given Mr. Nelson an opportunity, he could have perhaps tried to attempt to make accommodations to have those witnesses appear via telephone conference or something to that effect. But what happened here was that the agency admitted the letters without any indication to Mr. Nelson that it would be rejecting the veracity of the witnesses' statements within them. And that's the precise type of gotcha analysis of the evidence that SAVA or ARIA generally prohibits. Counsel, can I just ask you on that point, you used the word weight and I think that's right. I mean, the IJ certainly weighed the credibility of these witnesses, but that's what IJs do, right? I mean, there's always an issue of weight here. So I understand your argument regarding corroboration. And I think we have said that if there is going to be an issue of corroboration, a lack of corroboration, and you got to walk through the OBDU-I factors and make sure that the petitioner has a chance to address that issue. But that case in Luzinga dealt with an actual instance by IJ saying there was no corroboration, right? That's not what occurred here. So did that happen? Did the IJ somewhere in the record say, listen, I don't think this is corroborated. I think this needed corroboration as it happened in Luzinga. Or are you inferring that that's what was being done when they decided this issue? It's more of an inference here, Your Honor. However, the underlying policy for the corroboration rule is equally applicable here because again, Mr. Nelson was on no notice that the relative weight and credibility of the letters would be disregarded. And he could have made arrangements for the IJ to engage in a more exacting review of the witnesses who submitted those letters. But that was- Well, you're getting right into my earlier question, Mr. Lochman, which is when you say he had no notice that they would be questioned. That's what immigration judges do all the time. They weigh, they look at the evidence and they weigh it. And how could he not have been on notice that evidence that he put in would be weighed and it might be found wanting? Well, there's two questions to your answer, Your Honor. Firstly, he was pro se at the immigration judge hearing back in July of 2017. And then secondly, they were admitted without objection, without any countervailing evidence from the government. And there was again, really no discussion as to, or really any reason for Mr. Nelson to doubt as a pro se litigant, that the agency would not accept the testimony in the letters. But separate and apart from that, because I do see that my time is running a bit short. I do wanna at least briefly address the motion to reopen issues here as well, because separate and apart from the agency's disregard of the letters, there was then additional evidence that was- I wanna ask a question that goes back to the letters. Is there a difference between accepting the letters without objection and the contents of those letters, and then determining that those letters are insufficient to establish risk of torture, as opposed to lack of cooperation? I'm sorry, Your Honor, your audio cut out very briefly. Do you mind restating your question, please? Yes, is there a difference between accepting the letters as true, but finding they're insufficient to establish risk of torture, as opposed to finding a lack of corroboration? I guess there theoretically could be, but again, it ties back to the agency's reasoning, and that's not quite what was done here, because the agency pointed out that the letters or the letter writers were never crossed example. And so it seems to me that they're really questioning the credibility of the testimony within it, accepting the letters, but then disregarding the actual truth of the testimony in there. And so the agency could have actually provided Mr. Nelson notice of that, and then he could have made arrangements for the IJ to- I don't think anybody's gonna debate that counsel, right? I mean, there's certainly, and this goes back to Judge Jordan's opening question of the recursive loop, right? I mean, they could have, I mean, they could have gone back and forth in a couple of different rounds here, but I read the Abdulli line of cases regarding the requirement of providing notice if corroboration is gonna be an issue as centered on the petitioner's testimony, not other evidence that was put in. In other words, if I'm going to weigh the totality of the record, I have to let the petitioner know that, so there can be successive opportunities to rebalance the weight. And so if that's right, then again, this does seem like it comes back to IJ doing what IJs always do, which is weighing the evidence that is brought in by the petitioner to support his or her claim, and then making reasonable inferences and determinations based on that. Why is this not right within that heart? To a degree, Your Honor, again, it ties back to the reasoning in that the IJ never gave Mr. Nelson the opportunity to demonstrate that the witnesses within who were providing these letters had the opportunity to provide credible testimony. Doesn't he have that opportunity right out of the gate? I mean, it's his choice whether or not to call witnesses. It's his choice whether or not to arrange for telephonic appearances. It's his choice to decide how he's gonna present his case. And if he chooses to rest on a paper record, is he really in a position to say that's unfair because I didn't know you might not believe everything that was said in this letter. If I'd known you might question the veracity, then my world would have been different. I'd have done something different. But is it the obligation of the agency or of a court looking at a witness's statement to say, you know what, it's just possible I may not believe everything you say. And it's on you to show up with the proof. You've got a burden of proof. That is correct, Your Honor. However, a separate element of the IJ's analysis that I think I disregarded in answering your questions is that with respect to Mr. Nelson showing that people in Jamaica do believe he's gay as a result of the Bad Boys Gang rumors, the IJ also mentioned that Mr. Nelson did not cooperate any evidence beyond his own testimony that people in Jamaica believe he is gay. Now, the letters went so far as to do that, but the IJ still rejected them without giving Mr. Nelson notice or opportunity to cooperate. And so that's part of the issue here as well. It's not separate and apart from the fact that the agency disregarded all of the weight, but they never actually gave him the opportunity to cooperate the fact that people in Jamaica do in fact believe that he is gay. All right, well, you're a little past time, but you know what, we'll give you just a moment here. If there's something additional you feel you need to say with respect to the motion to reopen. I think I'd just like to point out that the agency never properly addressed Miri in the first instance with respect to his motion to reopen. When we look at the motion to reopen, the agency had already admitted that there was a harmless error with respect to acquiescence and that the reason it was harmless was because the risk of torture hadn't been established in the first instance. And then when Mr. Nelson submits more letters, which the agency says show that he would now be in danger of return to Jamaica, they said that was insufficient to show that police would not now protect him. And so we see that they actually applied the evidence to the wrong Miri prong because they only considered its relevance to acquiescence and not the risk of future torture. And that was a significant error made by the BIA separate from all the other issues raised in the party's briefing. Thank you, Your Honor. All right. Thanks, Mr. Loughnane. Ms. Miles. Good morning, Your Honors. Like Mr. Loughnane mentioned, my name is Emily Miles. I'll be addressing the acquiescence prong of Mr. Nelson's cat claim. So the record here demonstrates that the Jamaican government will be willfully blind to the risk of torture that Mr. Nelson faces and such acquiescence can be proven on two independent grounds. The first is that the Jamaican government is willfully blind to gang violence. Here, both the United States government and the agency have stated that the gang violence acquiescence was not properly considered and therefore remand would be appropriate. Yeah, so you can just move past that because they agree that they blew that part. Sure. So then the second ground is that the Jamaican government is willfully blind to anti-gay violence. The agency found that the Jamaican government was not willfully blind to such violence. However, in doing so, the agency improperly isolated statements and ignored the ultimate conclusion of the evidence on which it relied. A more meaningful- So you're arguing about the weight. You're arguing about how they weighed it. We're arguing that they didn't, they carry picked the evidence improperly and ignored the ultimate conclusion of the evidence itself. Yes. Okay. So are we in a position to say, do we have the authority to say, we don't like the way you weighed evidence? I believe you have the authority to say that you didn't properly analyze the evidence, so you need to do it again. So this court has already set standards in the way that the government, or sorry, the agency weighs the evidence. So for example, in Dovey Attorney General, this court looked at the anti-buggery law, which is also something that the agency looked at in Mr. Nelson's claim. So in Dovey Attorney General, this court said that it doesn't matter if the law is not enforced, if the government still acquiesces to violence. So it's just something that this court has weighed time and time again, if the agency is not properly analyzing the evidence and the evidence needs to be analyzed properly to determine if CAP should be granted. So something, again, that the agency also looked at is that the agency identified a program that allows victims of anti-gay violence to report it to the police. And the agency relied on this program really heavily in deciding that the government does not acquiesce to anti-gay torture. However, were the agency to look at the very next paragraph of the evidence that they relied on, it would see that the evidence explicitly finds that the reporting program does not work to provide any protection to victims of anti-gay violence or sympathizers of the gay community. Ms. Miles, I wanted to shift away from acquiescence for a minute to the issue of ineligibility for withholding of removal. The landscape changed a bit between the first briefing and the second briefing. And so we're only dealing with the question of whether or not the felonies that he was convicted of were particularly serious crimes. And I think that the briefing adequately said there was a three-part test. You look at the elements, you look at the nature and circumstances of the offense. And the BIA laid that out exactly and said, that's what we do. We look at the elements and then we look at the nature and then we look at the circumstances underlying them. And your briefing says, well, they didn't look at the elements. What more do you think the BIA had to do? They clearly looked at the nature and the circumstances, but they mentioned the elements. They said they agreed with the IJ that the elements could bring it within the ambit of a particularly serious crime. So what more would we have to tell them to do? So we believe that what happened was that, like Lou Zyga, which was also decided by this court, the BIA used the steps of NAM to correctly cite NAM, but they jumped immediately to step two. So here they relied on things like Mr. Nelson's prison statement, Mr. Nelson's trial record and his detail of the crime. That's all step two. That's all the facts and circumstances. They almost all, but ignored the elements of the crime. And that is an error under the NAM standards set by the agency. Okay, and we say the elements are enough to bring it within the ambit of particularly serious crime? I'm sorry, can you say that again? Can we agree that if we look at the elements as particularly serious? So I think that then that would still require a remand for the agency to address in the first instance. If NAM wasn't properly applied, then it needs to go back down to the agency for it to more explicitly look at the elements, because especially in situations like Mr. Nelson's, where a marijuana offense is perhaps different from a more straightforward offense that has a more straightforward federal analog. It is very important that the agency properly apply matter of NAM and Luzaga and Bessardo Valle, which here they did not. Hold on, Ms. Miles, your time has expired. Let me ask Judge Mabee if he's got any further questions. I don't. Judge Bolton, is there anything further you wanna ask? No, thank you. Okay, Ms. Miles, thank you. Appreciate your argument. And Mr. Lachnane, we'll hear back from Mr. Lachnane on rebuttal, and we'll ask counsel for the United States to proceed, Ms. Juarez, Ms. Juarez. Good morning, your honors. Anna Juarez for the respondent, attorney general. First, I'll address the particularly serious crime determination. As we stated in our briefing, the court can uphold that based on two different reasons, both because it's a per se, particularly serious crime, an aggravated felony for which he was sentenced to five years in prison, and also under the NAM analysis. And your honors had some questions about that. The board did not err in applying NAM. Their lusega was not a change in how NAM is applied. Denise in 2011 applied NAM. It emphasized that it's not a categorical approach. They need to consider whether the elements of the offense bring the crime into the category of particularly serious crime. And how did that happen? How did the agency do that in this case? In this case- Where did the agency do that? The immigration judge, it went through the elements and it's an aggravated felony determinations. It correctly cited the NAM and must bring elements within the ambit of particularly serious crime. The immigration judge noted that this is a drug trafficking crime, which the attorney general explained in matter of YL is presumptively particularly serious. Like there's no questions whether drug trafficking would be a particularly serious crime unless matter of YL there's elements that someone has to prove that it's a tiny amount. And here the agency correctly stated that it must meet the elements. And then under NAM and this court's case law, it can then go on to address the nature of the circumstances, the sentence. There's no requirement that it goes- Let's assume that we agreed with you and we got past the withholding part and we're dealing with the cat claim, which seems to be where most of the firepower in the briefing is directed and it's where the motion to reopen is directed. So let's focus on that for a minute. And first off, just to deal with the acquiescence and pretty quickly, you did, we read your right. You conceded that they blew it as to the gang violence piece. So if we disagreed with you on whether or not the prospect of future torture had been handled correctly, it would have to go back for the acquiescence discussion, right? Correct, that's what we stated in our brief. If the record compels the reversal of the risk of torture prong, we would ask that it be remanded to the agency to look at the acquiescence portion. Okay, now you, in talking about the prospect of future torture, the BIA decision says, look, the fact that there was past torture doesn't mean there's going to be future torture. That may be true, but does that really handle the matter? I mean, this is a guy who got shot and there's no disagreement that it was motivated for one of the reasons, for the reason he said it was and that these are very dangerous people. Does it show an adequate handling of the evidence to say, well, you got shot, but that was then, and that doesn't mean it's going to happen again. Part of the argument I think I'm hearing from the petitioner here is, they just blew the evidence off. They didn't, you know, they said it's not enough, but they had nothing on the other side. They had evidence that was accepted as credible by the asylum, credible fear officer. Evidence that was accepted as very, very credible by the IJ. They had the letters that said, they're still looking for him. They shot him before, they still want to kill him. They had evidence that the guy knows these people from his childhood. So it's not like he's some stranger to him. This is an old bite from the neighborhood. They're not going to forget him. All that's in front of them. And they just say, hey, you got shot, so what? Seven years ago, it's not going to happen again. I mean, under those circumstances, what's wrong with the petitioner's argument that they should have told us if that wasn't enough, holy smokes, that's not an appropriate, that's not a fair handling of the evidence. What's wrong with that pitch? The agency indicated that it considered his claim. It considered the letters. It considered that he had been shot, why they shot him. It didn't, unlike other cases where it's just ignored or not cited, they addressed it. They addressed that there were a lot of country conditions evidence here. Well, they addressed it by saying, Ms. Juarez, they addressed it first by, on one hand, seeming to say, well, we give it full weight, these letters. And then on the other hand saying, yeah, but they weren't cross-examined. And here's why, you know, and they look like they're all written by the same person and the signatures are kind of suspect and we don't believe this. I mean, how, one might be forgiven for looking at that and saying, yeah, you said you gave it full weight, but you didn't give it full weight. And if you really thought that this needed something more, you were under obligation under OBDULAI to tell us that we needed something more. You couldn't just say, you can't pretend you're giving it full weight and then not give it full weight. Where's the error in that reasoning? Well, I believe the agency did give it full weight. They said they did and found that it was speculative. I mean, the letters were that they submitted- How can you say, I'm giving it, you tell me that you're saying they're still looking for him. They still want to get him. And then say in the next breath, yeah, but we don't believe that, that's just speculation. I think giving full weight to what the friends said that people were looking for them, the agency pointed out there's no, they didn't state that there were any threats. They didn't state how they knew anything. Most of the first four letters submitted in 2016 talked about were even more vague and just talked about how Jamaica was violent. And they thought that their friend would be harmed if they came back. And the agency looked at that. It said, there's really no specific threats by gangs in these letters. In the four new ones filed with the motion to reopen, they're more specific, more detailed than the four previous ones were. So I think with regard to the first set, they're just, it was very vague, no specific threats. And as your honors had pointed out, the agency wasn't required to say, you submitted all this evidence. I don't think it's enough. Do you wanna go get some more? By the time it was on remand, he had counsel. He had a chance to call witnesses if he wanted. But as your honors noted, there isn't an endless loop of this isn't enough, you can get more in order to convince us. True enough, but by the same token, there's not a way is there for the government to avoid Abdallah by making credibility judgments that would ordinarily be couched in the language of corroboration, but just not uttering the words corroboration. I take it that that's the petitioner's point here is they pretended that they were given full weight, but they didn't do that. And if they thought that corroboration was needed, that's when Abdallah kicks in. And by avoiding the word corroboration, they can't avoid the responsibility that Abdallah puts on them. So that's the argument I want you to respond to is is it, and maybe you have, maybe you've given the best and fullest answer you can, that's okay. But I understand them to be saying they really did make a corroboration kind of decision. They just didn't want to comply with Abdallah so they didn't say the words. Is that a fair reading of what happened here? Without being in the head of the adjudicators, I don't think that it was a corroboration and trying to get around it. I truly think looking at it myself, they saw the only specific evidence were the letters and they were so vague about their friend being hurt if he comes back, a genuine concern, but just not the kind of evidence that shows a clear probability that this person would be tortured if he came back. The agency also noted it had been seven years since it happened. He stayed five months in the country, including a two-week vacation while he was there. And so the agency looked at the whole record while it was deciding, including the letters. And just because there are letters doesn't mean that- It wasn't just the letters, right? I'm looking at page 32 of their opening brief and they say the agency didn't adequately consider the record. The reasonable fear officer found that rumors are spreading that Mr. Nelson is gay and they didn't address that. And now I'm paraphrasing. It does not address the officer's separate finding that the bad boys have warned that Mr. Nelson should not return to Jamaica. This is not letters coming from friends in Jamaica. This is their assertion of what the reasonable fear officer's statement was and that there's no accounting for that. There's no dealing with that. How do you answer that? So it's an asylum officer that interviews a person who's entitled to only withholding. It's based on his evidence. The standard that they are applying is, it's like a reasonable, it's basically the asylum. Is there like a well-founded fear and should we put them in withholding only? So it's a lower standard than we're looking at here. I understand all that and I apologize because I'm not making myself clear. I'm not asking about asylum. I'm asking you to respond to their assertion that even if you didn't like our letters and you didn't think that was enough, you didn't even engage with other stuff in the record. His testimony matters. It's part of the record. And the asylum officer heard him and said, I believe you. He told them, they want me. If I go back, they're gonna try to kill me. They are still looking for me. And the asylum officer believed it. And so did the IJ. The IJ said, it's very, very credible. So if you believe the testimony of the petitioner, how can you then say, yeah, but this is all speculation. Either, go ahead. I was gonna say that the finding by the asylum officer isn't evidence. It's another agency decision that isn't before this court. And the agency considered his testimony as part of it, his fear of going back. He hasn't been back, the threats. And that's part of the agency's testimony. He, it was in 2011 that this happened and he's very credible. They don't think that he's making up, but he doesn't have a clear probability of future torture based on the total record, including his testimony, including his friends' fears for him, including the time that he spent there. They just didn't find that. It all comes down to weight. All comes down to weight. It does. And whether the record compels the conclusion that he would be tortured if he goes back to Jamaica. Okay. And I'm happy to answer any other questions if your honors have any. Counselor, can you talk about the motion to reopen? You know, part of the dynamic here is let's assume, let's assume we agree with the premise that there wasn't an abdullahi trigger here. But you still have the petitioner coming back and saying, well, okay, I understand what you're identifying as defects based on the weight you've described. Here's more weight that goes to the very issue. And the agency never looks at that. Why isn't that a problem? Why isn't that a separate issue that we need to address? I believe the agency did look at the letters and whether, as they stated, whether it changed the outcome and the motion to reopen, it's a much heavier burden to get it reopened. And the agency looked at the four letters, which were the only things submitted with the motion to reopen. And they're a lot like the previous four letters. They are more specific. The friends that he asked to write letters for him were more specific in those letters, but the agency found that it just didn't change the outcome of their earlier decision. And although, and petitioners argued that they didn't address the risk of torture, but as we argued in our brief, I think there's enough in the board decision to show that it did. And it went also to the risk of torture, particularly because the statements that it refers to in the letters really went to whether he would be tortured in the future by the gang members. Thanks. Let me ask you if I can get my colleagues to indulge me for just a moment, something additional about the motion to reopen. I understand that we've got a highly deferential standard of review for this, but the gang members, the failure to grapple with the gang violence issue, the failure to consider that at all, doesn't that, by just focusing on government acquiescence and in that point only on one piece of government acquiescence, not on both the points that the petitioner was making, doesn't the motion to reopen actually fail to adequately address the arguments put before the board and require a remand, granting of the PFR? We got gang members. Well, you've acknowledged that they didn't engage with the acquiescence thing appropriately, and yet there's a pretty good argument that maybe they didn't engage with the portion with respect to the rumors of them being gay appropriately either, because they didn't actually address the central point they have, which is not whether the man's gay or not, but whether in fact rumors are circulating to that effect and there's anti-gay violence on the island. So those two things, an acknowledged error and a decent argument that there's error on the other side of it, the additional prong of it, lead one to wonder whether, look, doesn't this indicate an inadequate job by the BIA in addressing the overall motion, including the credible fear of future, excuse me, future torture, and therefore the motion to reopen should be reconsidered. They should think about it and analyze it correctly. As long as the board gave the court enough to meaningfully review the, whether it changed the outcome in its decision, whether it abused its discretion, the court wouldn't need to remand. However, that's kind of the question, whether there's enough to meaningfully review the risk of torture portion, which as I pointed out is what the court needs to decide. And if the court finds that the record compels the reversal of that, then we would object to sending it back for the acquiescence portion. But for the motion to reopen, I believe there is enough language that the court can meaningfully review the court's denial of the motion to reopen based on the risk of torture prong. Okay. Judge Mady or Judge Bolton? Nothing further. No questions, thank you. Thank you, Your Honor. Thank you very much, Ms. Juarez. Mr. Loughnane, we'll hear you on rebuttal. Thank you, Your Honor. Just a few brief points. Firstly, with respect to the underlying appeal, regardless of cooperation, there's still plenty of other issues that warrant granting Mr. Nelson's petition. As you pointed out, there's significant testimony in the record that the immigration judge never referenced or never even considered. Namely, his own credible testimony that the bad boys gang has communicated to others since 2016 that he should not return to Jamaica. Now, the government has asserted that the agency did consider it, but we have really no indication of that. And to answer the question, we have Liam Burse, the Attorney General, which provides- Let's deal with the standard of view, Mr. Loughnane. You have to demonstrate that the record compels the opposite conclusion on the fact. How do you get past that very high bar? Well, respectfully- I understand you don't like how they weighed the evidence and you made a substantial evidence argument, but how do you get past compels an opposite conclusion? Well, respectfully, Your Honor, that is not necessarily the appropriate standard because under substantial evidence review, the agency has an obligation to consider all relevant evidence and cannot ignore relevant evidence that contradicts its own findings. So as you pointed out- That's true, that's true. But we've also said pretty directly, the fact that they don't talk about evidence doesn't mean they didn't consider it. That's correct, Your Honor. But then we have Liam Burse, the Attorney General, which tells us that the BIA must indicate, or excuse me, that the BIA has a duty to explicitly consider evidence that material bears on the claim and it does not meet its duty when it does not address statements contrary to its conclusion. It must indicate that it considered such evidence and if it rejects it, explain why. And here we have no reason to understand why the agency rejected Mr. Nelson's own credible testimony that the Bad Boys gang has communicated to others that he should not return to Jamaica and that evidence directly refutes its own consideration. That's simply the passage of time here demonstrates that the Bad Boys gang is no longer interested in him because we see five years, at least, after the Bad Boys gang had shot him, that they are still talking about him and circulating rumors. Now, separate and apart from that, I do also want to just briefly remind the court that the particularly serious crime issue is only a bar to withholding and not deferred removal under cap, which both claims are presented here. And then lastly, with respect to the motion to reopen, we have pointed out in both our opening brief on the motion to reopen and our reply brief that the standard that the agency applied that it must likely change the outcome is the inappropriate standard here because the only relevant considerations are whether a prima facie case for the underlying substantive form of relief is relevant and whether the new evidence was material. That changing the outcome of the case is only relevant when the ultimate form of relief is discretionary, such as asylum, but that's not the case here because cap is mandatory if the two elements are considered. Thank you, your honors. All right. Any further questions, Judge Maynard, Judge Bolton for Mr. Lochnam? No. Okay. Thank you, counsel on both sides. Very well argued. We appreciate the service of Drexel students for representing Mr. Nelson in this matter. And we've got the matter under advisement. Thank you. Thank you.